## APPEAL OF MIDLAND REFINING CO. (No. 1).

Docket No. 709.   Submitted March 31, 1925.   Decided July 10, 1925.

Upon the evidence, *held*, that the taxpayer and the Inland Oil Co. were affiliated during the calendar year 1919.

*Lyle T. Alverson, Esq.*, for the taxpayer.
*Laurence Graves, Esq.*, for the Commissioner.

Before GRAUPNER, LANSDON, and GREEN.

The deficiency asserted in this appeal is for the calendar year 1919, and is in an amount less than $10,000. It arose from the refusal of the Commissioner to permit the taxpayer corporation and the Inland Oil Co., a corporation, to file a consolidated return as affiliated corporations under the provisions of section 240 (b) of the Revenue Act of 1918. From the evidence submitted the Board makes the following

### FINDINGS OF FACT.

The Midland Refining Co., hereinafter called the "Midland," and the Inland Oil Co., hereinafter called the "Inland," were organized practically simultaneously in 1915, pursuant to the plan of a group of individuals to engage in the production and refining of crude oil and the marketing of the refined products. Two corporations were organized instead of one, pursuant to the advice of counsel as to the legal advantages resulting from such a division of ownership and operation and because it was known that a financial advantage would result. The Inland was the producing company and the Midland the refining and marketing company.

Three individuals, namely, W. G. Skelly, W. Irving Osborne, and F. A. Pielsticker, were primarily responsible for the original plan and the organization, development, and operation of the two companies. Immediately after the corporations were organized, 90 per cent of the stock of the Midland and 78.26 per cent of the stock of the Inland were issued to Osborne and Skelly. Thereafter these shares were by Skelly and Osborne sold and transferred to individuals selected by Skelly and Osborne, all of whom were employees of the company, relatives, friends, or business associates of the original holders of the stock. The stocks were not offered to the public. Skelly was made the president and Pielsticker the vice president and manager of both companies. During the years in question the holdings of the Skelly family in the Midland were 33.63 per cent of the stock of that company. Skelly owned 8.55 per cent and his wife and two daughters each owned 8.38 per cent. These shares were gifts from Skelly, and he controlled them absolutely. Skelly personally owned

28.19 per cent of the Inland stock. Pielsticker owned 0.85 per cent of the Midland stock and 5.07 per cent of the Inland stock. Osborne owned 29.8 per cent of the Midland stock and 17.81 per cent of the Inland stock. Collectively, these three (including in Skelly's holdings the holdings of his wife and daughters) owned 62.71 per cent of the stock of the Midland and 51.07 per cent of the stock of the Inland.

All the stock of both companies was common stock with full voting power. There were no written agreements or restrictions as to the buying, selling, or voting of the stock. Proxies to vote the stock were usually given to the officers. There was complete harmony between the stockholders and the officers. The stockholders had confidence in the ability of the officers, and actually left the management, control, and operation entirely in their hands. The stockholders' meetings of both companies were usually attended only by Skelly, Osborne, and Pielsticker, who held proxies to vote the other stock. These three men had complete control not only of the stock of both corporations but also of the operation of both.

The Midland had about 60 stockholders, while the Inland had 40 stockholders. Fifteen stockholders owned stock in both companies. Their holdings amounted to approximately 80 per cent of the stock of both. These 15 stockholders were business friends, employees of the companies, or relatives of Skelly and Osborne. The remaining 20 per cent was also owned by business friends and associates of the organizers of these corporations. Approximately 45 stockholders of the Midland did not own any stock of the Inland and 25 stockholders of the Inland did not own any stock of the Midland.

Those owning stock in both companies and the percentages of their holdings are as follows:

| Name. | Per cent Midland. | Per cent Inland. | Relation to Companies or to Skelly and Osborne. |
|---|---|---|---|
| Bradford | 2.27 | 2.52 | Director of Midland. |
| Ferrell | 2.02 | 4.44 | Business associate of Skelly. |
| Frazier | 3.03 | 2.52 | Wife's estate holds stock. |
| Griffin | 1.68 | 1.51 | Owned one-fourth interest of oil farm with Inland. |
| Hazlett | 2.32 | 5.07 | Director of Inland. |
| Kauffman | .40 | 1.26 | No testimony. |
| Mead | .25 | 1.26 | Business associate of Osborne. |
| Muir | .44 | 1.26 | Business associate of Osborne. |
| Nicholson | .07 | .25 | Not known to manager. |
| Nilsson | .14 | 2.52 | Clerk and personal secretary of Skelly. |
| Osborne | 29.08 | 17.81 | One of organizers of both companies. |
| Pielsticker | .85 | 5.07 | Vice president and manager of both companies. |
| Skelly, W. G. | 8.55 | | President of both companies. |
| Skelly, Caroline | 8.38 | 28.19 | Daughter of Skelly. |
| Skelly, Gertrude | 8.38 | | Wife of Skelly. |
| Skelly, Joan | 8.38 | | Daughter of Skelly. |
| Thorp | 1.68 | 5.05 | Business associate of Osborne. |
| Wood | .42 | 1.26 | Not known to manager. |
| | 79.30 | 79.98 | |

The principal intercompany transactions between the two companies were as follows:

The Midland took over all the crude oil produced by the Inland in 1917, 1918, and 1919, except in a few instances where it was impracticable to transport the oil to the Midland's lines. Arrangements were made, where possible, for the purchasers of the oil not taken by the Midland to deliver like quantities of oil to it.

In 1918 the Midland borrowed $150,000, giving its own assets as security, for the express purpose of loaning said amount to the Inland. This amount was loaned to the Inland and interest was charged at the same rate paid by the Midland. This loan was repaid in 1919.

The large storage yards and garages of the Midland were used for the storage of pipe, equipment, and trucks of the Inland almost to the same extent as used by the Midland, but no charges were made. The Midland laid pipe lines for the Inland with the Midland crew at the actual cost of labor and no charge for superintendence.

The auto trucks of the Midland were without charge used from time to time by the Inland for hauling equipment. Some of the employees, such as secretary, manager, auditor, members of the traffic department, and field scouts, worked for both companies, being paid by one or the other. The evidence does not disclose any effort on the part of either company to put this exchange of services on a business basis. In some instances a charge was made for the services rendered, which charge was at actual or less than actual cost. The office building occupied by the two companies was owned by the Midland. The rent charged the Inland was very low.

The Commissioner refused to permit the two corporations to file a consolidated return on the ground that they were not affiliated corporations, within the provisions of section 240 (b) of the Revenue Act of 1918, and in a deficiency letter mailed October 4, 1924, asserted a deficiency.

#### DECISION.

The deficiency determined by the Commissioner is disallowed.

#### OPINION.

GREEN: Cases of this class require the closest scrutiny of facts which in most legal controversies would be considered as collateral or immaterial. This is necessarily so because of the general terms used in the statute.

Section 240 (b) of the Revenue Act of 1918 reads as follows:

(b) For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially

all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.

" Controlled " as that word is,used in the statute can not have a precise and definite meaning. We have held that "the control . * * * referred to in the statute, whether it be legal or otherwise, means control of the voting rights of stock." *Appeal of Canyon Lumber Co.*, 1 B. T. A. 473. We have also held that—

> * * * The object sought to be accomplished by Congress, in enacting section 240 of the Revenue Act of 1918, was to tax as a business unit what really was a business unit, and to prevent the component parts thereof from evading taxation by means of inter-company transactions. Since Congress intended to require two or more corporations, where substantially all their stock " is owned or controlled by the same interests," to file a consolidated return in order to prevent them from evading income tax, we can find no reason for holding that the " control " contemplated by the statute means only legal control; that is, control enforceable by legal means, for control not arising or flowing from means legally enforceable may be just as effective in evading taxation as if founded on the most formal and readily enforceable legal instrument. There is no authority in the section of law referred to or in its context, so far as we can see, for assuming that Congress intended to use the word " control " in other than its ordinary and accepted sense. On the other hand, we believe that a proper construction of the statute, if it is to serve the purpose for which it was intended, requires us to hold that the " control " mentioned therein means actual control, regardless of whether or not it is based upon legally enforceable means. The control, however, must be shown to be a genuine and real control actually exercised, and it cannot be established by mere assertions or agreements between majority and minority stockholders unsupported by facts. Potential control of stock is not sufficient in itself to justify consolidation. No definite rule, applicable to all cases, can be laid down for recognizing control. Each case must, therefore, be considered and decided upon its own facts and surrounding circumstances. *Appeal of Isse Koch & Co.*, 1 B. T. A. 624.

If we had only the word " controlled " to interpret and apply, the solution would be greatly simplified, but we must consider it in connection with the words " substantially all " and " the same interests." While the extreme cases may be determined upon mathematical proportions, we must in the vast majority of cases look to all the facts and circumstances surrounding the organization and operation of the companies and to the result accomplished. Under such conditions it is extremely difficult, if not impossible, to enunciate rules of general application. Each case is a separate problem.

It appears from the record that prior to the organization of the Inland and the Midland companies it was the plan of the organizers that the two companies should be owned and operated to the same effect as if they were in fact one company. The division of the activities and properties was made upon the advice of counsel and because it was believed that greater earnings would result therefrom.

Immediately after the organization of the companies Osborne and Skelly owned 90 per cent of the stock of the Midland and 78.26 per cent of the stock of the Inland. A part of this stock was sold to employees, business associates, and close personal friends of the two men named. From the evidence it is clear that these two individuals so disposed of their stock as to assure themselves of the actual control and domination of both companies. The evidence convinces us that they were entirely successful in their effort to get and retain during the years in question the actual control and domination. Skelly, Osborne, and Pielsticker were practically the only stockholders who ever attended meetings. They owned 62.71 per cent of the stock of the Midland and 51.07 per cent of the stock of the Inland. At these meetings they voted by proxy all stock not standing in their own names.

The intercompany transactions show that there was the closest cooperation between the two organizations, and that no effort was made to allocate between the companies the cost of materials, services, or labor furnished by the one to the other. It is a clear case of commercial and economic unity.

Approximately 80 per cent of the stock of each company was held by persons owning stock in both companies. It is apparent that the two companies were, in fact, operated as one and each for the benefit of the other. Skelly, Osborne and Pielsticker dominated and controlled both of these corporations and their efforts were directed not to making a success of one company but to making a success of both companies, which effort was the result of a preconceived plan consistently carried out.

A careful examination of the stockholdings and the relationships existing between the various holders shows that substantially all of the stock is owned or controlled by the same individuals. It seems to follow, naturally, if a group of individuals owns or controls substantially all of the stock of both corporations, and if such ownership or control is by all exercised for one purpose, namely, the joint success of the corporations, that these individuals meet the requirements of the words " the same interests."

We believe that the two corporations were affiliated and that any other conclusion would be contrary to the meaning of the statute.